*Chesapeake Bay Foundation, Inc. and Magothy River Association, Inc. v. DCW Dutchship Island, LLC, et al.*, No. 77, September Term, 2013, Opinion by Adkins, J.

**ADMINISTRATIVE LAW — STANDING TO PARTICIPATE BEFORE COUNTY BOARD OF APPEALS:** A person or group does not have standing to appeal an administrative agency's decision solely because a person or group with similar interests in the litigation is also participating in the administrative appeal.

**MD. CODE (2013, 2013 REPL. VOL.), § 10-305 OF THE LOCAL GOVERNMENT ARTICLE — EXPRESS POWERS ACT — HOME RULE COUNTY POWER TO CREATE RULES OF PROCEDURE FOR BOARD OF APPEALS:** The Express Powers Act's broad grant of power to Home Rule counties to create a Board of Appeals and grant original or appellate jurisdiction to that board allows the county to create reasonable rules of procedure for that board. This includes the ability to create rules of appellate standing and set conditions precedent to access to a board of appeals that is given appellate jurisdiction. Thus, the Anne Arundel County Board of Appeals rule requiring that persons be aggrieved and have participated in the hearing before the Administrative Hearing Officer does not exceed the Express Powers Act's broad grant of authority.

**ADMINISTRATIVE LAW — DUE PROCESS — RIGHT TO CROSS-EXAMINE WITNESSES:** The rule requiring that administrative bodies ruling on zoning matters allow cross-examination will be satisfied if one or more representatives of the views of parties adverse to the witness is permitted full cross-examination. When presenting a due process challenge, a non-party must at least demonstrate how cross-examination questions that it would have posed would have been meaningfully different than those that were asked.

**ZONING LAW — COUNTY BOARD OF APPEALS — APPLICATION FOR VARIANCE:** The Anne Arundel County Board of Appeals ("the Board") erred in determining that the granted variance was the minimum necessary to afford an applicant relief, when the Board awarded the applicant a variance for 320 square feet of impervious surface for a boat ramp without adequately considering whether this ramp was necessary to the applicant's reasonable and significant use of the property.

IN THE COURT OF APPEALS

OF MARYLAND

No. 77

September Term, 2013

CHESAPEAKE BAY FOUNDATION, INC.
AND MAGOTHY RIVER ASSOCIATION, INC.
et al.

v.

DCW DUTCHSHIP ISLAND, LLC, et al.

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

Opinion by Adkins, J.
Harrell, J., joins in judgment only.
Watts, J., concurs.

Filed:  August 4, 2014

Roughly 35 million years ago, an asteroid over a mile wide crashed into the Earth at a speed of about 70,000 miles per hour. Hillary Mayell, *Chesapeake Bay Crater Offers Clues to Ancient Cataclysm*, National Geographic News, (November 13, 2001), http://news.nationalgeographic.com/news/pf/57998027.html. This collision created the Chesapeake Bay Crater. *Id*. One of the by-products of this celestial collision is the subject of this contest—Little Island in the Magothy River ("the Island").

In 2000, DCW Dutchship Island, LLC ("DCW"), a corporation wholly owned by Daryl Wagner ("Wagner"), purchased the Island. At that time, the Island measured approximately 1.92 acres in area and was improved by a single-family house and related structures built in the 1920s.[1] Wagner demolished the house and set about building a new one. The circumstances surrounding this construction are not new to us. As we explained in *McHale v. DCW Dutchship Island, LLC*:

> In or about 2001, Daryl Wagner, a member of DCW and a Maryland registered home builder, acting on behalf of DCW, demolished the old summer cottage and removed the debris, without the necessary permits or variances required by the Critical Area Law and County ordinances. Then, Wagner constructed the following structures or impervious surface areas on the Island: (1) a new 2,883 square foot home; (2) replacement sheds for the two preexisting sheds; (3) a 66 square foot gazebo; (4) a boat ramp and concrete driveway with approximately 2,668 square feet of surface area to

---

[1] The Island contained the following impervious surface area: the original house, representing 1,911 square feet; concrete and wood steps, representing 45 square feet; a boat house and deck, representing 890 square feet; and two sheds, representing 159 square feet. The Board rejected testimony that a driveway existed on the Island before Wagner's development, and as a result, did not include that figure in its finding that the Island historically contained 3,005 square feet of impervious surface.

accommodate his amphibious vehicle; (5) 846 square feet of sidewalks; and (6) a pool and deck totaling 1,433 square feet.

\* \* \*

In November 2004, the County authorities discovered the construction activities on the Island and notified DCW of the numerous violations. On 28 December 2004, DCW sought variances from the unobserved requirements of the Critical Area Law for each of the structures and improvements on the Island. DCW sought also an amendment to the critical area buffer map, which prohibits most development activity within 100 feet of the shoreline.

A County Administrative Hearing Officer heard the evidence for and against the requests for variances. The Magothy River Association ("MRA") appeared at the variance hearings on 5 June 2005 and 20 September 2005 to oppose DCW's requests. The Hearing Officer granted some of the variances on 27 October 2005. Wagner appealed administratively the denials, and the MRA, the Chesapeake Bay Foundation ("CBF"), and the Maryland Critical Area Commission for the Chesapeake and Atlantic Coastal Bays (the "Commission") appealed the decision to grant the variances, all to the County Board of Appeals.

415 Md. 145, 151–52, 999 A.2d 969, 972–73 (2010) (footnote omitted).[2] At the Anne

Arundel County Board of Appeals (the "Board") hearing, Wagner moved to dismiss MRA

and CBF as parties to the administrative proceedings. The Board ultimately concluded that

CBF did not have standing to appeal the granted variances because it did not participate in

the hearing before the Administrative Hearing Officer ("AHO"), as required by § 3-1-

---

[2] Because this Court thoroughly addressed the underlying facts of this case in *McHale v. DCW Dutchship Island, LLC*, 415 Md. 145, 999 A.2d 969 (2010), we will keep our restatement of the relevant facts brief. When necessary to assess the parties' arguments, we will enrich our discussion of the facts.

2

104(a) of the Anne Arundel County Code ("AACC").[3] After 24 evenings of hearings on the subject, the Board revised the decision of the AHO to include certain conditions on the variances.[4]

The Maryland Critical Area Commission for the Chesapeake and Atlantic Coastal Bays (the "Commission"), MRA, CBF, and Wagner all sought judicial review of the Board's decision in the Circuit Court for Anne Arundel County. These appeals were consolidated by Circuit Court order. In addition, CBF filed a "Motion for Summary Judgment" limited to the issue of whether the Board improperly excluded CBF from the variance portion of the proceedings. The court denied all motions relevant to the variance matter. The Circuit Court then affirmed the decision of the Board, observing:

> The proceedings below were fair, reasonable, and in accordance with applicable law. After sorting through a tremendous volume of evidence, the Board rendered a decision supported by competent and substantial evidence. Reasonable minds will disagree, as demonstrated by the 35 pages of concurring and dissenting opinions. However, absent legal error, this Court may not substitute its own wisdom for the considered judgment of the Board and will therefore . . . AFFIRM the decision of the Board of Appeals.

---

[3] Section 3-1-104(a) of the Anne Arundel County Code ("AACC") provides that:

> A person aggrieved by a decision of the Administrative Hearing Officer who was a party to the proceedings may appeal the decision to the Board of Appeals, except that a person who meets the threshold standing requirements under federal law has standing to appeal a decision of the Administrative Hearing Officer granting or denying a critical area variance for development in the buffer to the Board of Appeals.

[4] Discussed *infra*.

The Commission and CBF appealed the Circuit Court's decision to the Court of Special Appeals, arguing that the Critical Area Act[5] applied to the variance proceedings, that the Board erred in refusing to allow CBF to participate as a party in the administrative process, and that the Board did not base its decision on substantial evidence in the record. In an unreported opinion, the Court of Special Appeals rejected these arguments and affirmed the Circuit Court.

MRA and CBF (collectively "Petitioners")[6] petitioned this Court for *certiorari*. We granted this petition to consider the following questions, which we have restated for clarity and concision:

1. Did CBF have standing to participate in the variance proceedings before the Board of Appeals on the grounds that MRA, which advocated the same position, had standing?

2. Does AACC § 3-1-104(a) violate the Express Powers Act, thus making the Board's denial of standing to CBF on the basis of it erroneous?

3. Did the Board of Appeals violate its own rules when it held that CBF could not cross-examine witnesses, resulting in CBF being denied due process?

4. Did the Board of Appeals err in granting Wagner after-the-fact variances?

For the following reasons, we answer the first three questions in the negative and the fourth in the affirmative, but only in part.

---

[5] Discussed *infra*.

[6] The Respondents are Anne Arundel County, Daryl Wagner, and DCW Dutchship, LLC.

4

## DISCUSSION

Petitioners present three arguments in support of their request that we should remand this matter to the Board so that CBF may participate in the creation of a record in the variance proceedings.[7]

### *CBF's Standing To Participate As A Party Before The Board Of Appeals*

We first address Petitioners' argument that MRA's administrative standing before the Board confers standing on CBF. Petitioners claim that *Sugarloaf Citizens' Association v. Department of Environment*, 344 Md. 271, 686 A.2d 605 (1996), *partially abrogated by statute*, Md. Code (1982, 2013 Repl. Vol.), § 5-204(f) of the Environment Article, *as stated in Patuxent Riverkeeper v. Maryland Department of Environment*, 422 Md. 294, 298, 29 A.3d 584, 586 (2011), and *Garner v. Archers Glen Partners, Inc.*, 405 Md. 43, 949 A.2d 639 (2008) stand for the proposition that if one party has standing to participate in the proceedings, so do all other parties on the same side of the case—what might be called "piggy-back" standing. Using these cases, Petitioners reason that because MRA appeared before the AHO, and the Commission had a statutory right to challenge the variances, CBF need not have appeared before the AHO, or for that matter even have been aggrieved, to have standing before the Board.

Petitioners argue that the Court of Special Appeals specifically relied on *Sugarloaf* for this point in a similar context. They point to the following language in a footnote in *Chesapeake Bay Foundation, Inc. v. Clickner*, 192 Md. App. 172, 191 n.6, 993 A.2d 1163,

---

[7] For clarity's sake, we have rearranged the order of Petitioners' arguments.

1175 n.6 (2010): "'It is a settled principle of Maryland law that, where there exists a party having standing to bring an action . . . we shall not ordinarily inquire as to whether another party on the same side also has standing.'" (quoting *Garner*, 405 Md. at 54, 949 A.2d at 645–46) (internal citations omitted). CBF and MRA claim that by denying CBF "piggy-back" standing, the Board erred.

Anne Arundel County (the "County") urges us to construe *Sugarloaf* and *Garner* as reflecting considerations of judicial economy rather than administrative due process. As the County sees it, the standing rule announced in *Sugarloaf* "appears to be based on little more than the fact that, if one party has the standing necessary to bring a justiciable controversy before the court, it simply is unnecessary for the court to decide whether other parties on that side of the case have standing as well." Wagner makes similar arguments, claiming both that CBF ignores the full holding of *Sugarloaf*, and that the *Sugarloaf* Court did not apply its broad standing doctrine to the administrative context.

Tracing the roots of "piggy-back" standing, we examine what *People's Counsel for Baltimore County v. Crown Development Corporation*, 328 Md. 303, 614 A.2d 553 (1992), *Garner*, and *Sugarloaf* say about standing. In *Sugarloaf*, we explained:

> It is a settled principle of Maryland law that, "'where there exists a party having standing to bring an action . . . we shall not ordinarily inquire as to whether another party on the same side also has standing.'" *People's Counsel v. Crown Development Corp.*, 328 Md. 303, 317, 614 A.2d 553, 559–60 (1992), quoting *Board v. Haberlin*, 320 Md. 399, 404, 578 A.2d 215, 217 (1990).
>
> The record in the present case establishes that the Buchanans had standing to maintain this action. Consequently, it is

6

> unnecessary to determine whether any of the other plaintiffs also had standing.

344 Md. at 297, 686 A.2d 618 (citations omitted). In *Crown Development*, the limited scope of the doctrine is more readily discernable. As the Court explained:

> Finally, respondent argues that the People's Counsel for Baltimore County should not have been permitted to intervene at the circuit court level. Respondent does not, however, suggest how the presence of People's Counsel has prejudiced it. **Alison Tucker was a proper party before the circuit court, and had standing to appeal to the Court of Special Appeals and to petition this Court for certiorari. Accordingly, the presence of People's Counsel was not required to obtain appellate review at any level** in this case.

328 Md. at 317, 614 A.2d at 559–60 (emphasis added). Similarly, in *Garner*, we said:

> Our traditional reluctance to address issues of standing not necessary to the outcome of a case is highlighted in *Sugarloaf Citizens Ass'n v. Northeast Maryland Waste Disposal Authority*, 323 Md. 641, 650 n.6, 594 A.2d 1115, 1119 n.6 (1991). There we declined to address a possible standing issue because it was unnecessary, noting "[i]n light of our decision on the merits, we need not and do not reach any issue of standing."

405 Md. at 54–55, 949 A.2d at 646.

Nothing we said in *Sugarloaf, Crown Development*, or *Garner* suggested that this "piggy-back" standing rule would apply in an administrative proceeding or trial, where different considerations abound. Indeed, if we adopted Petitioners' position, unlimited persons who held views aligned with a party—however this would be determined—could join an administrative proceeding or trial, and be accorded the right to present witnesses, cross-examine opposing witnesses, make motions, and have other rights of a party. We can only imagine how unwieldy and even circus-like such a proceeding might be.

7

Petitioners' reliance on *Clickner* as "binding precedent" establishing CBF's standing before the Board of Appeals does not persuade us otherwise. *Clickner* also involved CBF and MRA attempting to oppose variances before the Board after the AHO granted those variances. 192 Md. App. at 174, 993 A.2d at 1165. After a motion from the landowner, and two evenings' worth of hearings, the Board dismissed CBF and MRA's complaint for a lack of standing—this time because the Board found that the Petitioners were not aggrieved within the meaning of AACC § 3-1-104(a). *Id*. at 181, 993 A.2d at 1169. The intermediate appellate court held that the Board applied the wrong definition of "aggrieved" for the purposes of determining whether CBF or MRA had administrative standing. *Id*. at 187, 993 A.2d at 1173. The footnote relied on by Petitioners simply explained the court's decision to remand the matter to the Board to determine "whether **either** party meets the correct definition of 'aggrieved.'" *Id*. at 191, 993 A.2d at 1175 (emphasis added).

In context, it is clear that *Clickner*, like this Court's cases discussed above, was only explaining that if either party had judicial standing at the circuit court, then an appellate court would not address the issue of whether both parties had standing. None of these cases suggest that this rule of appellate procedure, designed to streamline appellate cases by avoiding unnecessary questions of standing, should be extended to administrative hearings or court or jury trials, where a primary concern is to facilitate presentation of evidence in a fair and efficient manner. Petitioners confuse a principle of appellate review concerning when this Court will address a question of standing, for a substantive holding regarding when a party has standing before an administrative body.

***The County's Power Under The Express Powers Act To Create Conditions Precedent
For The Board Of Appeals***

Petitioners next argue that standing for the purpose of administrative proceedings is "more lenient than judicial standards and [is] designed to encourage citizen participation." Certainly, as we observed in *Sugarloaf*, "[t]he requirements for administrative standing under Maryland law are not very strict." 344 Md. at 286, 686 A.2d at 613. Yet, as we went on to explain, this leniency only exists "[a]bsent a statute or a reasonable regulation specifying criteria for administrative standing[.]" *Id.* Here, there was a statute specifying criteria for administrative standing—AACC § 3-1-104(a). Thus, the issue before us turns on whether AACC § 3-1-104(a) is a permissible exercise of the County's power.

This question implicates our decisions regarding Home Rule, i.e., the powers given to counties to create laws and regulations pursuant to the Express Powers Act. The Home Rule system was enacted pursuant to a Maryland constitutional provision adopted in 1915. *See Ritchmount P'ship v. Bd. of Supervisors of Elections for Anne Arundel Cnty.*, 283 Md. 48, 56, 388 A.2d 523, 528–29 (1978). The history leading up to the adoption of Home Rule via Article XI-A of the Maryland Constitution was narrated by Judge Levine in this seminal case:

> The waning years of the nineteenth century witnessed the birth of a national movement, the purpose of which was to restore and revitalize local government by giving citizens of counties and municipalities the power to legislate as to local matters free from undue encroachment by state legislatures. In Maryland, as elsewhere, the "Home Rule" movement was fueled by widespread public indignation over excessive legislative interference with and insensitivity toward local problems and concerns, and by a growing dissatisfaction with the enormously inefficient system of performing local law-making

functions at the state level. It was this popular demand for increased local autonomy that led ultimately to the ratification of Article XI-A at the general election of November 1915.

*Id*. at 55–56, 388 A.2d at 528–29 (citations omitted). As Judge Levine explained, Article XI-A of the Constitution authorized the Legislature to take steps to implement Home Rule, which it did through the Express Powers Act:

Article XI-A does not in and of itself confer *legislative* power upon the counties. Instead it mandates that the General Assembly expressly enumerate and delegate those powers exercisable by counties electing a charter form of government. Md. Const., Art. XI-A, § 2. In compliance with this constitutional injunction, the Legislature enacted in 1918 the Express Powers Act, which, as amended, endows charter counties with a wide array of legislative and administrative powers over local affairs. Art. 25A, § 5. These "legislative powers" are those usually associated with the objects of government — that is, powers to legislate for the benefit of the health, safety and general welfare of the local community.

*Id*. at 57, 388 A.2d at 529 (italics in original) (footnote omitted).

Petitioners argue that AACC § 3-1-104(a), which provides that "[a] person aggrieved by a decision of the Administrative Hearing Officer who was a party to the proceedings may appeal the decision to the Board of Appeals," violates the Express Powers Act. Petitioners maintain that this provision exceeds the scope of the powers granted by the Act, which only confers to county governments the power to enact local laws providing:

(1) [F]or the establishment of a county board of appeals . . . (3) for the adoption by the board of rules of practice governing its proceedings; and (4) for the decision by the board on petition by any interested person[.]

Md. Code (1957, 2011 Repl. Vol.), Article 25A, § 5(U). Petitioners argue that because the Express Powers Act grants a right to appeal to the Board of Appeals, and does not require

10

that the person first have appeared before the AHO, the County has created an unauthorized obstacle to citizen participation in variance decisions. Relying on our decision in *Hope v. Baltimore County*, 288 Md. 656, 421 A.2d 576 (1980), which held that county provisions that exceed the limits of the Express Powers Act are invalid, Petitioners maintain that AACC § 3-1-104(a) should be stricken as an illegal law.

In *Hope*, we considered a county law that allowed for a party aggrieved by an executive, administrative or adjudicatory county order to appeal that decision directly to the circuit court without first appealing to the county board of appeals. 288 Md. at 658–61, 421 A.2d at 577–79. We held that the county provision violated the Express Powers Act because creating a county board of appeals was the exclusive remedy that a county may create under the Express Powers Act. *Id*. at 666–67, 421 A.2d at 582. Petitioners argue that by creating a condition precedent to access its Board of Appeals, Anne Arundel County similarly exceeds the powers granted to it by the Express Powers Act.

The County counters that there is no conflict between the Express Powers Act[8] and the AACC. The County explains it has the authority to create a two-tiered process of review for administrative decisions. It argues that this Court explained in *Ritchmount* that, under Sections 1 and 1A of Article XI-A of the Maryland Constitution, a county may

---

[8] Anne Arundel County correctly cites to the Express Powers Act as embodied in Md. Code (2013, 2013 Repl. Vol.), § 10-305 of the Local Government Article ("LG"), as Article 25A of the Maryland Code was repealed effective October 1, 2013 by 2013 Md. Laws Chapter 119, § 1. That CBF cites to a now-repealed provision does not alter our analysis, as the Revisor's Notes to LG § 10-305 explain that "[t]his section is new language derived without substantive change from former Art. 25A, § 5(U)."

11

establish the form and structure of its government. Thus, avers the County, it had the authority to set up the AHO, irrespective of the Express Powers Act.

As the County argues, Maryland's appellate courts have been unwilling to construe narrowly the powers delegated to counties. The County cites *Prince George's County v. Silverman*, 58 Md. App. 41, 53, 472 A.2d 104, 110 (1984) for the proposition that "where [County] legislation bears a reasonable relationship to the implementation of an enumerated power, the legislation will be upheld." The County directs us to our decision in *County Commissioners for Montgomery County v. Supervisors of Elections of Montgomery County*, 192 Md. 196, 208, 63 A.2d 735, 740 (1948), to wit, our holding that "[w]hen an apparent conflict [between Constitutional provisions] arises, it cannot be doubted but that literalism and verbalism must yield to the essential and underlying claims of the people of the State to have a reasonable and effective government." The County concludes that "in *the specific context* of *Local Gov't Article*, §10-305, it was hardly unreasonable for the County, in those matters in which the first 'tier' of administrative review is an evidentiary hearing before the Administrative Hearing Officer, to construe 'any interested person' entitled to appeal to the Board of Appeals as limited to a person who was a party to the proceedings before the Administrative Hearing Officer."

We have characterized the Express Powers Act as an "expansive grant of authority." *Ritchmount*, 283 Md. at 58, 388 A.2d at 530. As we have explained:

> The purpose and intent of . . . the [E]xpress [P]owers Act was to take from the legislature and give to the County the exclusive power to enact local laws, and the reasons for this delegation of power, commonly called home rule, were first to reduce as far as possible the log jam of unacted on measures in

12

the late days of the legislative session in Annapolis which had caused passage of laws that had not received careful scrutiny or due consideration and, second, "to permit local legislation to be enacted solely by those directly affected by it without interference [by] representatives [from] other sections of the State." *Scull* [*v. Montgomery Citizens League*, 249 Md. 271, 274, 239 A.2d 92, 94 (1968)].

*Montgomery Citizens League v. Greenhalgh*, 253 Md. 151, 160, 252 A.2d 242, 246 (1969).

As we further indicated, "[g]ratification would not be afforded the purposes of home rule or the reasons which prompted it if the language of [the Express Powers Act] were not to be construed as a broad grant of power to legislate on matters not specifically enumerated in Art. 25A." *Id*. at 160–61, 252 A.2d at 247. Thus, in order to determine whether AACC § 3-1-104(a) is an appropriate exercise of the powers delegated to the County, we first must determine whether this subsection implicates a matter specifically enumerated in Title 10 of the Local Government Article.[9]

Md. Code (2013, 2013 Repl. Vol.), § 10-305 of the Local Government Article ("LG") provides the particulars for county boards of appeals. It states, in pertinent part:

(a) *Established*. — A county may enact local laws to provide for:
> (1) the establishment of a county board of appeals, whose members shall be appointed by the county legislative body;
>
> (2) the number, qualifications, terms, and compensation of the members of the county board of appeals;
>
> (3) the adoption by the county board of appeals of rules of practice that govern its proceedings; and

---

[9] Again, we consider cases interpreting an earlier version of the Express Powers Act, which are equally applicable to the current version found in the LG § 10-305.

(4) a decision by the county board of appeals on petition of any interested person, after notice and opportunity for hearing, on the basis of a record before the board.

(b) *Jurisdiction.* — The county board of appeals may have **original jurisdiction or jurisdiction to review the action of an administrative officer** or unit of county government over matters arising under any law, ordinance, or regulation of the county council that concerns:

(1) **an application for a zoning variation** or exception or amendment of a zoning map;

(2) the issuance, renewal, denial, revocation, suspension, annulment, or modification of any license, permit, approval, exemption, waiver, certificate, registration, or other form of permission or of any adjudicatory order; or

(3) the assessment of any special benefit tax.

(c) *Decision.* — When issuing a decision, the county board of appeals shall file an opinion that shall include a statement of the facts found and the grounds for the decision.

(d) *Judicial Review.* — (1) Any person aggrieved by the decision and a party to the proceeding before the county board of appeals may seek review by the circuit court for the county.

LG § 10-305 (emphasis added). To be sure, nothing in the statute as written confers to counties the power to create conditions precedent for access to a board of appeals. Additionally, as Petitioners remind us, LG § 10-305(a)(4) mentions that the municipality, in creating a county board of appeals, may make appeal before the board available to "any interested person."

Yet, we decline to hold AACC § 3-1-104(a) to be a violation of the Express Powers Act. The County's ability to set reasonable conditions precedent to access to its Board of

14

Appeals is an exercise of its Home Rule. As we have explained, "the power to *establish* and *organize* local government springs directly from Article XI-A [of the Constitution] and thus lies beyond the competence of the General Assembly or any other branch of state government to alter or erase." *Ritchmount*, 283 Md. at 59, 388 A.2d at 530 (italics in original).

LG § 10-305 is part of a broader scheme allowing Maryland's counties Home Rule. As we explained in *Scull, supra*, part of the purpose of Home Rule is to allow a county to pass legislation that pertains directly to it without interference from the state government. LG § 10-305 provides a framework for creating a board of appeals, but it does not give all the necessary specifics. Filling in the gaps left by the Express Powers Act is well within the power of a county government.

We have previously explained a charter county's broad authority to establish the mechanics of operation of its board of appeals:

> A charter county is authorized to enact laws providing for decisions by the board of appeals "either originally or on review of the action of an administrative officer or agency." A charter county is thus given the option, as to any particular matter encompassed by § 5(U), to vest the board of appeals with original jurisdiction or with appellate jurisdiction.

*United Parcel Serv., Inc. v. People's Counsel for Balt. Cnty.*, 336 Md. 569, 588, 650 A.2d 226, 236 (1994); *see also Halle Cos. v. Crofton Civic Ass'n*, 339 Md. 131, 142, 661 A.2d 682, 687 (1995) (interpreting *United Parcel Service* as holding that charter counties may vest the board of appeals with appellate or original jurisdiction over any subject matter in the Express Powers Act). This discretion to set up either appellate or original jurisdiction

15

is reflected in LG § 10-305(b)(1), which explicitly allows a charter county to grant appellate jurisdiction to the board of appeals for "an application for a zoning variation or exception or amendment of a zoning map."

The authority to grant appellate jurisdiction to the board of appeals regarding zoning variances necessarily presumes the authority to set up an entity charged with making initial variance determinations. We see no reason why, consistent with this power to confer appellate jurisdiction on the Board, the County should not also be allowed to require AHO participation as a prerequisite to appellate standing. [10] Indeed, were we to hold AACC § 3-1-104(a) unconstitutional, the County's power to limit the Board to appellate jurisdiction over zoning variances would be a hollow one.[11]

Having resolved the issue of Home Rule, we return to Petitioners' arguments that the Board's decision to deny CBF standing ran afoul of our general rule that administrative standing is easy to achieve. This argument fails because it ignores an important prerequisite to application of the general rule—that there be no specific regulation to the contrary. As we stated in *Sugarloaf,* "[a]bsent a statute or a reasonable regulation

---

[10] We observe that CBF does not argue that it failed to participate as a party in the AHO hearing due to a lack of knowledge of the hearing or some other reason. In particular, it does not allege any impropriety in the required notice that advertised the AHO hearing. The AHO found that the file contained "certifications of mailing to community associations and interested persons[,]" and concluded "that the requirements of public notice [were] satisfied." Additionally, multiple CBF members attended the AHO hearing, although they did not identify themselves on the attendance sheets as CBF members.

[11] This differs from the buffer map amendment portion of the Board hearing—in which CBF was determined to have standing—because the buffer map amendment was granted without a hearing.

16

specifying criteria for administrative standing, one may become a party to an administrative proceeding rather easily." 344 Md. at 286, 686 A.2d at 613. Here, AACC § 3-1-104(a) represents just such a statute. It is both a proper use of the County's authority, and a reasonable condition precedent to access to the Board. Accordingly, CBF was not improperly denied standing by the Board's invocation of AACC § 3-1-104(a).

### *CBF's Due Process Rights To Cross-Examine Witnesses Before The Board*

Petitioners' ultimate standing claim is that the Board denied CBF due process by not allowing it to cross-examine witnesses. They direct us to the Rules of Practice and Procedure of the Board of Appeals as found in AACC Appendix B. Board of Appeals Rule 4-104(c), provides that:

> The parties shall have the opportunity to cross-examine witnesses. The Chair shall permit a representative or representatives of persons in opposition the opportunity to conduct cross-examination.

Petitioners aver that a representative of CBF, who opposed the variances, was denied the opportunity to cross-examine witnesses. CBF subsequently moved to intervene in the variance portion of the case. The Board denied this motion and precluded CBF's representative from cross-examining any witnesses in the variance action. The Board also prohibited CBF's representative from passing notes to MRA's representatives suggesting cross-examination questions during the variance proceedings. Thus, Petitioners argue, regardless of their lack of standing, the Board failed to follow its own rules in terms of allowing persons in opposition to cross-examine witnesses, regardless of party status. Petitioners claim this denied CBF due process.

17

In support of CBF's right to cross-examine witnesses, Petitioners direct our attention to *Ross v. Mr. Lucky, LLC*, 189 Md. App. 511, 985 A.2d 93 (2009). In that case, an appeals board held a hearing after the Respondent, Mr. Lucky, LLC, had its site plan denied. *Id*. at 517, 985 A.2d at 96–97. Ross, who owned a waterfront residence bordering the area Respondent proposed to convert into a seasonal outdoor tiki bar, moved to intervene as a party to the appeal. *Id*. at 517, 985 A.2d at 97. The board denied the motion. *Id*. When Ross asked for permission to examine the witnesses called by the parties, this request was also denied. *Id*. at 517–18, 985 A.2d at 97. After hearing from witnesses and members of the public, the board granted Mr. Lucky's requested variances. *Id*. at 519, 985 A.2d at 98.

The Court of Special Appeals held that "the Board's outright denial of all right of cross-examination to Ross, in the face of his request for cross-examination, was a violation of his due process rights." *Id*. at 525, 985 A.2d at 101–02. The intermediate appellate court explained:

> Under Maryland law, regardless of the language of a particular county zoning ordinance or the procedural rules for its board of appeals, due process affords interested parties a reasonable right to cross-examine witnesses in a proceeding in which an administrative agency performs adjudicatory functions.

*Id*. at 522, 985 A.2d at 100 (citations omitted). The Court of Special Appeals then ordered that the decision of the Board be vacated and that the matter be remanded to the board for further proceedings. *Id*. at 526, 985 A.2d at 102. Petitioners present CBF's right to standing as on all fours with *Ross*:

CBF appeared before the Board to contest both the buffer map amendment and variance requests. CBF was denied party status with respect to the variance testimony and was prohibited from cross-examining any of the applicant's witnesses. CBF moved to intervene but was denied. These rulings denied CBF due process and require that the matter be remanded to the Board.

Wagner distinguishes *Ross* on grounds that CBF was not a party to the variance proceedings before the Board, and therefore did not have constitutionally or statutorily protected due process rights. Alternatively, Wagner argues, even if CBF was entitled to cross-examine witnesses, CBF suffered no prejudice. In Wagner's view, MRA and the Commission were able to cross-examine all the witnesses extensively, and therefore vacating the Board's decision is unnecessary.

Petitioners believe prejudice is not part of the equation, and that "[t]he right to cross-examine is a fundamental right that may not be abrogated unless waived." They direct us to our decision in *Bryniarski v. Montgomery County Board of Appeals*, 247 Md. 137, 150, 230 A.2d 289, 297 (1967), *partially abrogated by statute*, Md. Code (1982, 2013 Repl. Vol.), § 5-204(f) of the Environment Article, *as stated in Patuxent Riverkeeper v. Maryland Department of Environment*, 422 Md. 294, 298, 29 A.3d 584, 586 (2011), in which we held that there was a prejudicial denial of due process "by the Board's refusal to permit cross-examination of the applicant's witnesses[.]" Petitioners ask us to follow the rule in *Bryniarski* and also hold that the Board's denial of cross-examination by CBF is a due process violation necessitating a new hearing before the Board. Further, Petitioners aver, the Board's own rule on cross-examination applies to all persons in opposition. Thus, they

19

conclude, CBF's lack of party status—rightly or wrongly denied—does not meaningfully distinguish *Ross* from the present case.

We read *Bryniarski* and *Ross* differently from Petitioners, and decline to hold that the Board denied CBF due process. This case arises from a context decidedly different from that in either *Bryniarski* or *Ross*. In both of those cases *all* cross-examination of the applicant's witnesses was denied. *Bryniarski*, 247 Md. at 140, 230 A.2d at 292; *Ross*, 189 Md. App. at 525, 985 A.2d at 101. Because no cross-examination was allowed by any opponent, we found a denial of due process. Interestingly, the *Ross* Court compared, with approval, the Anne Arundel County Board's rule of procedure regarding cross-examination to the Calvert County provision at issue there.[12] The intermediate appellate court said:

> By contrast, the rules governing board proceedings in some other counties expressly provide for the right of cross-examination. *See, e.g.,* Rules of Practice and Procedure of the Board of Appeals, Appendix B, Anne Arundel County Code (2005), Rule 4–104(c) ("The parties shall have the opportunity to cross-examine witnesses. The chairman shall **permit a representative or representatives of persons in opposition** the opportunity to conduct cross-examination.").

*Ross*, 189 Md. App. at 525 n.9, 985 A.2d at 101 n.9 (emphasis added). Notably, this rule does not allow cross-examination by *every* opponent. Rather it contemplates one or more representatives of the opponents to cross-examine. Here, pursuant to the same rule, MRA was allowed full cross-examination of the witnesses for the applicant, as was the Commission. MRA, CBF, and the Commission all opposed the application for variance

---

[12] The same rule remains in effect today.

and make the same arguments on appeal. MRA and CBF have filed joint briefs. Indeed, the President of MRA testified before the Board that "[i]t is [MRA's] policy right from the very beginning that we do not support variances. . . . [W]e've always been opposed to a variance of any kind." CBF has the same goal.[13]

The rule requiring that administrative bodies ruling on zoning matters allow cross-examination will be satisfied if one or more representatives of the views of other opponents is permitted full cross-examination. The opponent's right to due process in such context does not mean that every single person present has the right to cross-examine. If that were the rule, administrative hearings could be extended for unreasonable lengths of time. Once reasonable cross-examination has occurred, it is the burden of the persons seeking *additional* cross-examination to show that their questions would be meaningfully different, although they *must be given reasonable opportunity* to do so. When queried by this Court at oral argument, Petitioners' counsel[14] admitted that no cross-examine questions were proffered at the administrative hearing and did not, even with hindsight, articulate what

---

[13] In fact, it was MRA who asked CBF to assist in the appeal to the Board:

> [I]t is my intention to bring in to help with this hearing, to bring in and to help with the Magothy River Association, and to help with the 20 communities that I represent, and the 500 dues-paying members that I have on board, it is in my interest, and in the interest in the Bay, in the interest in the State, and interest of all concerned to bring in the Chesapeake Bay Foundation because they have more expertise in certain areas that the MRA does not have.

[14] Petitioners' counsel at oral argument also represented CBF before the Board.

cross-examination questions it would have asked.[15] Even if CBF had no opportunity to do so during the questioning, it could have sent a letter to the Board outlining the specific areas of cross-examination that were not covered. CBF's counsel did not do this. Nor did counsel proffer the questions it would have asked in the Circuit Court or the Court of Special Appeals.[16] We are not persuaded that the dictates of due process require that we order a new administrative hearing in order that CBF, a non-party before the Board, ask cross-examine questions that, even at this late date, it has chosen not to identify.

Let us clarify what we are not saying. We do not retreat from this Court's pronouncement over 40 years ago that the "contention that actual prejudice must be shown before denial of procedural due process can be established is without merit," and that it would be a "mockery of justice" to so hold. *Town of Somerset v. Montgomery Cnty. Bd. of Appeals*, 245 Md. 52, 66, 225 A.2d 294, 303 (1966). Our holding here is narrow—that a non-party in CBF's position must at least demonstrate how cross-examination questions that it would have posed would likely have been meaningfully different than those that were asked. Such was not done at any level of this proceeding.

---

[15] At oral argument, CBF's counsel simply said that CBF "did not proffer anything."

[16] At the end of the variance proceeding, the Board invited members of the audience to testify in favor or against the variances. CBF did not take this opportunity to proffer any cross-examination questions it would have posed or explain how its interests had not been protected. Two members of the public made use of this opportunity to testify before the Board.

For the reasons stated above, we decline to remand this matter to the Board for the purposes of conducting a new series of hearings in which CBF is allowed to participate in cross-examination.

## *THE MERITS OF THE BOARD'S DECISION*

With the standing issues resolved, we now turn to the merits of the Board's decision granting certain variances to Wagner. Before doing so, we address the scope of our review and lay out the setting in which the Board's decision lies.

## STANDARD OF REVIEW

We recently described this Court's role in the review of zoning board decisions in *Critical Area Commission for the Chesapeake and Atlantic Coastal Bays v. Moreland, LLC*:

> Our role in reviewing the final decision of an administrative agency, such as the Board of Appeals, is "limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." In doing so, a reviewing court decides whether the Board's determination was supported by "such evidence as a reasonable mind might accept as adequate to support a conclusion." Moreover, a reviewing court "must review the agency's decision in the light most favorable to it; . . . the agency's decision is prima facie correct and presumed valid."

418 Md. 111, 122–23, 12 A.3d 1223, 1230 (2011) (citations omitted) (ellipsis in original).

## DISCUSSION

*Background – Critical Area Law*

23

Touching every aspect of this case is the Critical Area Law, and we start with the history and substance of that environmental protection statute. The General Assembly enacted the Critical Area Law in 1984. Md. Code (1973, 2012 Repl. Vol.), § 8-1801 of the Natural Resources Article ("NR"). Based on findings concerning the importance, fragility, and documented decline in the state of the Chesapeake Bay and its tributaries, the General Assembly "establish[ed] a Resource Protection Program for the Chesapeake and the Atlantic Coastal Bays and their tributaries by fostering more sensitive development activity for certain shoreline areas so as to minimize damage to water quality and natural habitats[.]" NR § 8-1801(a), (b)(1).

In describing the impetus for the Critical Area Law, the General Assembly highlighted the effect of recent development on the Chesapeake Bay area:

> Human activity is harmful in these shoreline areas, **where the new development of nonwater-dependent structures or an increase in lot coverage is presumed to be contrary to the purpose of this subtitle, because these activities may cause adverse impacts . . . to the Chesapeake and Atlantic Coastal Bays**, and thus it is necessary wherever possible to maintain a buffer of at least 100 feet landward from the mean high water line of tidal waters, tributary streams, and tidal wetlands[.]

NR § 8-1801(a)(4) (emphasis added).[17] NR § 8-1801(a)(4) previously phrased the presumption concerning lot coverage in terms of "impervious surface." Md. Code (1973,

---

[17] In Chapter 119 of the Acts of 2008, the phrase "impervious surfaces" was replaced with "an increase in lot coverage." Under NR § 8-1802(a)(17)(i) "lot coverage" is defined as "the percentage of a total lot or parcel that is: 1. Occupied by a structure, accessory structure, parking area, driveway, walkway, or roadway; or 2. Covered with gravel, stone, shell, impermeable decking, a paver, permeable pavement, or any manmade material." For convenience and conformity with the Board's parlance, we frame our discussion in terms of impervious surface rather than lot coverage.

24

2007 Repl. Vol.), § 8-1801(a)(4) of the Natural Resources Article ("Human activity is harmful . . . where the new development of . . . **impervious surfaces** is presumed to be contrary to the purpose of this subtitle[.]") (emphasis added). Thus, development that increases the amount of impervious surface in the critical area is a primary concern of the Critical Area Law. Indeed, the Legislature found "a critical and substantial State interest . . . in fostering more sensitive development . . . along shoreline areas of the Chesapeake and the Atlantic Coastal Bays and their tributaries so as to minimize damage to water quality and natural habitats." NR § 8-1801(a)(10).[18]

To accomplish the objectives of the Critical Area Law, the Legislature created the Critical Area Commission for the Chesapeake and Atlantic Coastal Bays, vesting it with broad power to carry out the purposes of the statute. NR §§ 8-1803, 8-1806. Yet the Legislature conferred the "primary responsibility for developing and implementing a [Critical Area] program" to each local jurisdiction in Maryland. NR § 8-1808(a). To meet the goals of the Critical Area Law, each local Critical Area Program must meet several requirements, including creating a comprehensive zoning map for the critical area, and crafting a system for the granting of variances to these zoning schemes. NR § 8-1808(c)(1)(iii).

As part of its Critical Area Program, Anne Arundel County promulgated specific standards and detailed criteria for granting variances to properties located in the critical

---

[18] NR § 8-1801(a)(10) was amended by Chapter 119 of the Acts of 2008. It now contains language to reflect the goal of fostering "more effective enforcement," in addition to fostering more sensitive development.

area. AACC § 3-1-207. Under this scheme, the Board of Appeals must make affirmative written findings that a variance applicant has satisfied each of several particular criteria.[19] AACC § 3-1-207(b); NR § 8-1808(d)(5)(ii) (stating that before granting a variance, "[t]he local jurisdiction [must find] that the applicant has satisfied each one of the variance provisions[.]").[20] These findings must arise in a specific context. First, the Board must "presume that the specific development activity [requested] . . . does not conform with the general purpose and intent of the [the Critical Area Law and the County's Critical Area Program.]" NR § 8-1808(d)(3)(ii)[21]; *see also* AACC § 3-1-207(b)(7) (requiring that the applicant "overcome the presumption contained in [NR] § 8-1808(d)(2)[.]"). The applicant "bears the burden of proof and persuasion" as to each of the variance criteria. *Moreland*, 418 Md. at 119, 12 A.3d at 1228 (citing NR § 8-1808(d)(3)).

The lodestar for the Board's consideration of a variance application is the statutory mandate that a variance can only be granted when "[d]ue to special features of a site, or special conditions or circumstances peculiar to the applicant's land or structure, a literal enforcement of the [C]ritical [A]rea [P]rogram would result in unwarranted hardship to the

---

[19] These criteria are enumerated in AACC §§ 3-1-207(b) and 3-1-207(e). We will confine our discussion to those criteria that, in Petitioners' view, the Board erroneously found to have been satisfied by DCW.

[20] This provision, previously labeled as NR § 8-1808(d)(4)(ii), was changed to NR § 8-1808(d)(5)(ii) by Chapter 651 of the Acts of 2009.

[21] This provision, previously labeled as NR § 8-1808(d)(2)(ii), was changed to NR § 8-1808(d)(3)(ii) by Chapter 650 of the Acts of 2009. The reference to NR § 8-1808(d)(2)(ii) in AACC § 3-1-207(b)(7) has not yet been revised to reflect this amendment.

applicant[.]" NR § 8-1808(d)(5)(i);[22] *see also* AACC § 3-1-207(b)(1) (requiring that in order to grant a variance, the Board find that "strict implementation of the County's [C]ritical [A]rea [P]rogram would result in an unwarranted hardship, as that term is defined in the Natural Resources Article, § 8-1808, of the State Code, to the applicant[.]"). Unwarranted hardship "means that, without a variance, an applicant would be denied reasonable and significant use of the entire parcel or lot for which the variance is requested." NR § 8-1808(d)(1).

We test the parties' arguments against the terms of the Critical Area Law, and the County's enactments that implemented that law. CBF and MRA strenuously contend that the Board erred by granting Wagner "after-the-fact" variances. The Board's Order announced these variances, and the conditions attached to them, as follows:

> For the reasons set forth in the foregoing Memorandum of Opinion, it is this 3rd day of Jan., 2007, by the County Board of Appeals of Anne Arundel County, ORDERED, that:
>
> \*     \*     \*
>
> 2) A variance of 36 feet to the required 100 foot minimum buffer along the southeast shore of the island and a variance of 32 feet to the required 100 foot minimum buffer (Section 1A-104(a)(1)) along the southwest shore of the island for the construction of a residence, septic system and installation of a well is hereby **GRANTED**;
>
> 3) A variance to permit the disturbance of slopes of 15% or greater as measured before development in the LDA (Section 1A-105(d)) for the installation of a septic system and related facilities is hereby **GRANTED**; and

---

[22] This provision, previously labeled as NR § 8-1808(d)(4)(i), was changed to NR § 8-1808(d)(5)(i) by Chapter 650 of the Acts of 2009.

4) A variance to permit new development activities in the buffer for the construction of an 8 foot by 40 foot impervious boat ramp/driveway to the west of the pier is hereby **GRANTED**.

All **VARIANCES** being subject to the following conditions:

a) There shall be no more than 3,325 square feet of impervious surface on the lot, inclusive of the 8 by 40 foot boat ramp/driveway;

b) The gazebo, pool, patio, sidewalks, accessory structures, and other impervious surface on site shall be removed, subject to lawfully issued permits, and the areas shall be revegetated;

c) All disturbance in the buffer shall be revegetated at a 3 to 1 ratio, with plantings on the property of native species;

d) The buffer on site should be planted to the extent possible, including the slopes adjoining the revetment;

e) A buffer management plan, execution of a forest conservation easement and all required mitigation will be required prior to the issuance of any permit;

f) The shore management system (Petitioner's Exhibit 63) for the northern and western shores of the lot must be implemented to provide appropriate sand nourishment and flora enhancement;

g) As per the RLD regulations, a 50 foot planted buffer shall be located and maintained between the principal structure and the crest of slopes with a 25% grade or greater; and

h) Stormwater from all impervious surfaces shall be directed to appropriate stormwater management devices for quality and quantity control.

According to Petitioners, the Board's Order was premised on an erroneous finding that Wagner satisfied all of the requirements for a variance contained in AACC § 3-1-207.[23] Specifically, CBF and MRA present seven arguments that Wagner failed to meet his burden of proof and persuasion to satisfy the variance criteria. These arguments involve the following variance requirements, which are set forth in subsections of AACC § 3-1-207.[24] These code provisions, which we have set out in the order we address them, dictate that:

- (b)(1) because of certain unique physical conditions, such as exceptional topographical conditions peculiar to and inherent in the particular lot . . . strict implementation of the County's critical area program would result in an unwarranted hardship[;]

- (b)(4)(i) [the variance request] is not based on conditions or circumstances that are the result of actions by the applicant, including the commencement of development activity before an application for a variance was filed;

---

[23] In their brief, Petitioners claim that the Board must provide a written finding that the applicant has met each of 12 variance requirements, citing AACC § 18-16-305. Petitioners identify the wrong statute. AACC § 18-16-305 sets forth the standards for granting zoning variances by the Administrative Hearing Officer. Here, we are reviewing a decision by the Board of Appeals, and its variance requirements are set forth in AACC § 3-1-207. Throughout our discussion we have replaced Petitioners' erroneous citations to the Administrative Hearing Officer's statute with the correct citations to the Board's statute.

[24] The Board's Order stated that because Wagner's variance requests were filed on December 28, 2004, it would "apply the [variance] standards as they existed prior to the effective date of Bill 4-05, being May 12, 2005." Yet, as the Court of Special Appeals observed, the parties briefed their case with reference to the current regulations codified in AACC § 3-1-207, rather than the pertinent pre-May 12, 2005 regulations, codified as AACC § 3-2-107. Having compared the currently codified regulations with the pre-May 12, 2005 regulations, we find no substantive differences between the two. Consequently, and to conform with the parties' briefs, we apply the current iteration, AACC § 3-1-207.

- (e)(1) the variance is the minimum variance necessary to afford relief;

- (b)(2)(i) a literal interpretation of COMAR, Title 27, Criteria for Local Critical Area Program Development, or the County critical area program and related ordinances will deprive the applicant of rights commonly enjoyed by other properties in similar areas[;]

- (b)(3) the granting of a variance will not confer on an applicant any special privilege that would be denied by:
    (i) COMAR, Title 27, or the County critical area program to other lands or structures within the County critical area;

- (b)(5)(i) [the granting of the variance] will not adversely affect water quality or adversely impact fish, wildlife, or plant habitat within the County's critical area[;]

- (b)(5)(ii) [the granting of the variance] will be in harmony with the general spirit and intent of the County critical area program[;] and

- (b)(7) the applicant, by competent and substantial evidence, has overcome the presumption contained in the Natural Resources Article, § 8-1808(d)(2), of the State Code.

We examine each of Petitioner's arguments regarding these variance requirements in turn.

### *Unwarranted Hardship*

Under AACC § 3-1-207(b)(1), variance applicants must show that due to conditions on the property, "strict implementation of the County's [C]ritical [A]rea [P]rogram would result in an unwarranted hardship[.]"  CBF and MRA posit that the denial of a variance would not cause Wagner to suffer an unwarranted hardship.  They explain that the County's grandfathering provisions would allow for Wagner to keep the Island's structures as they

30

had existed before the implementation of the Critical Area Program. Thus, Petitioners argue, denying Wagner the ability to construct a "wonderland" is not an unwarranted hardship. Petitioners charge that the Board failed to identify substantial evidence that limiting Wagner's redevelopment to the pre-existing footprint would represent an unwarranted hardship.

DCW and Wagner disagree. In their view, because the Island is a unique property, surrounded by water, almost entirely affected by the 100 foot buffer, and featuring the unusable footprint of the old house, a variance was necessary to build any house on the Island.

This Court closely examined the term "unwarranted hardship" in *Belvoir Farms Homeowners Association, Inc. v. North*, 355 Md. 259, 734 A.2d 227 (1999). There, we observed that "[t]his Court has said that '[t]he criterion for determining unnecessary hardship is whether the applicable zoning restriction when applied to the property in the setting of its environment is so unreasonable as to constitute an arbitrary and capricious interference with the basic right of private ownership.'" *Id*. at 276, 734 A.2d at 237 (quoting *Marino v. Mayor of Baltimore*, 215 Md. 206, 217, 137 A.2d 198, 202 (1957)). After surveying a number of national standards for unwarranted hardship, the *Belvoir* Court rejected the proposition that the unnecessary or unwarranted hardship standard was equal to the unconstitutional taking standard, and stated the following:

> The unwarranted hardship standard, and its similar manifestations, are equivalent to the denial of reasonable and significant use of the property. Whether a property owner has been denied reasonable and significant use of his property is a question of fact best addressed by the expertise of the Board of

31

> Appeals, not the courts. **Thus, we leave the application of this standard to petitioner's variance application to the Board on remand.**

355 Md. at 282, 734 A.2d at 240 (emphasis added).

Here, the Board found that the unwarranted hardship criterion was satisfied because "[n]o dwelling could be built without some variance." The Board explained that:

> The lot is an island within the Magothy River and the application of the minimum 100 foot buffer leaves only a small triangle of land in the center of the island beyond the reach of the minimum required buffer. However, since there are steep slopes on the island, the buffer must be expanded; therefore, no part of the island is left without restriction.

With respect to the location of the dwelling, these findings were supported by substantial evidence.[25] As we discuss *infra*, however, the size of the dwelling's footprint is another matter altogether. Nor have we yet addressed Petitioners' argument that the hardship is self-inflicted, an issue we take up next.

### *Self-Created Hardship*

---

[25] The relevant evidence from the record includes the following:

Mary Owens of the Critical Area Commission conceded that the entire island is in the buffer.

Ren Serey, then Executive Director of the Critical Area Commission, agreed that for a grandfathered lot, "it would be an unwarranted hardship if an applicant was not able to build a residence on a residential lot."

Civil Engineers Charles John Klein, III and Danny Boyd both testified that the pre-existing footprint would not support a house. Petitioner's expert, Tom Heil, suggested that the house could be built on pilings in the pre-existing footprint, but the Board rejected this testimony as "implausible."

From Petitioners' perspective, the actions of Wagner in building his house and other structures without permits overshadows all else. They aver that Wagner's request for variances arises from conditions that can only be characterized as self-created hardships that are not sufficient to justify a variance under the County Code. They rely on AACC § 3-1-207(b)(4)(i), which states that the Board may only issue a variance upon a written finding that the variance request "is not based on conditions or circumstances that are the result of actions by the applicant, including the commencement of development activity before an application for a variance was filed[.]" CBF and MRA cast Wagner's purported hardships as quintessential examples of self-created hardships, attributable to Wagner's unlawful development activities, not the inherent conditions on the Island.

Petitioners challenge Wagner's right to a variance to build a new house covering 2,883 square feet of impervious surface, when the pre-existing dwelling on the Island constituted only 1,911 square feet of impervious surface. Positing that Wagner could have obtained a variance for the pre-existing square footage under the County's grandfathering provision, Petitioners argue that it was only Wagner's desire for a larger home that necessitated the variance. As such, say Petitioners, it was a classic self-created hardship.

Petitioners also claim that the location of the requested variances was similarly based on Wagner's unlawful excavation and grading activity. In their view, Wagner's decision "to proceed without variances and approved plans and excavating the bluff back to the corner of the cottage exacerbated the need for variances." As stated earlier, Petitioners' civil engineering expert, Tom Heil, testified that Wagner had options apart

33

from installing stone revetment and excavation of the bluff, and concluded that a new home could have been constructed on the pre-existing dwelling's footprint.

CBF and MRA urge us to follow the reasoning of *Cromwell v. Ward*, 102 Md. App. 691, 722, 651 A.2d 424, 439–40 (1995), in which the Court of Special Appeals cautioned that "[w]ere we to hold that self-inflicted hardships in and of themselves justified variances, we would, effectively not only generate a plethora of such hardships but we would also emasculate zoning ordinances. Zoning would become meaningless."[26] In that case, the intermediate appellate court held that the Board improperly granted an after-the-fact variance sought by a landowner who had constructed a building that exceeded the zoning limit on height. *Cromwell*, 102 Md. App. at 726, 651 A.2d at 441. The court explained:

> It is not the purpose of variance procedures to effect a legalization of a property owner's intentional or unintentional violations of zoning requirements. When administrative entities such as zoning authorities take it upon themselves to ignore the provisions of the statutes enacted by the legislative branch of government, they substitute their policies for those of the policymakers.

*Id.* Petitioners ask us to reach the same conclusion regarding DCW's after-the-fact variances.

---

[26] Petitioners attribute this language to our Court, but the quoted material on which they rely comes from the intermediate appellate court.

*Cromwell v. Ward*, 102 Md. App. 691, 651 A.2d 424 (1995) involved the application of Baltimore County Zoning Regulations. Throughout our discussion, we rely on cases applying variance regulations apart from the precise iteration of the Anne Arundel County Code at issue in this case. In doing so, we recognize that the rationale used in evaluating variance criteria in analogous county ordinances is instructive in applying the same criteria at issue here.

Petitioners also draw our attention to *Chesley v. City of Annapolis*, 176 Md. App. 413, 933 A.2d 475 (2007). In *Chesley*, the Court of Special Appeals was faced with a property owner who built a house and a pool that "eliminated the possibility of locating a garage where no variance would be required[,]" then requested a variance to build a garage. *Id*. at 440, 933 A.2d at 491. The intermediate appellate court affirmed the Board's finding that Chesley's claimed hardship in building a garage was self-created. *Id*. at 441, 933 A.2d at 492. The court emphasized that instead of seeking a garage variance before starting construction, or building a smaller house that would permit a detached garage on another section of the property, Chesley built the house and pool at the risk that the Board would not approve a variance for the garage. *Id*. at 440–41, 933 A.2d at 491–92.

DCW and Wagner counter that their need for variances was not self-created, but was solely a result of the impact of the Critical Area regulations on the Island. They maintain that because the entire Island was located in the 100-foot buffer, any structure on the Island—apart from a structure on the previous dwelling's footprint—would require a variance. Importantly, they say that the pre-existing footprint of the old house was unusable, and so a variance was absolutely required.

Fortunately, our case law has been both consistent and clear in declaring what "self-created hardship" encompasses. This Court addressed the issue in *Salisbury Board of Zoning Appeals v. Bounds*, 240 Md. 547, 214 A.2d 810 (1965). The *Bounds* Court first observed the general rule stated in Rathkopf's seminal treatise, *The Law of Zoning and Planning*:

> "§ 1. Hardship Caused by Affirmative Acts of Commission.

35

> Where property, due to unique circumstances applicable to it, cannot reasonably be adopted to use in conformity with the restrictions of the zoning ordinance, hardship arises which is capable of being relieved through the grant of a variance. The restrictions of the ordinance, taken in conjunction with the unique circumstances affecting the property must be the proximate cause of the hardship. If the peculiar circumstances which render the property incapable of being used in accordance with the restrictions contained in the ordinance have been themselves caused or created by the property owner or his predecessor in title, the essential basis of a variance, i.e., that the hardship be caused *solely* through the manner of operation of the ordinance upon the particular property, is lacking. In such case, a variance will not be granted; the hardship, arising as a result of the act of the owner or his predecessor will be regarded as having been self-created, barring relief.
>
> This rule is simple and of general application in the several states.
>
> There is a uniform application of the rule in those cases in which there has been an act on the part of the property owner or his predecessor which has physically so affected the property as to create a unique circumstance or which in itself created either a practical difficulty or hardship in conforming to the restrictions of the ordinance."

240 Md. at 554–55, 214 A.2d at 814 (quoting 2 Rathkopf, *The Law of Zoning and Planning*, 48-1) (italics in original). The *Bounds* Court affirmed the Board's finding of a self-created hardship where the property owners created four apartments in a three-apartment dwelling, then requested a variance. 240 Md. at 555, 214 A.2d at 814. It was clear to the Court that "the resultant hardship could have been avoided if the [property owners] had used proper diligence in ascertaining what the density requirements were for a four apartment dwelling[.]" *Id*.

36

In *Ad + Soil, Inc. v. County Commissioners of Queen Anne's County*, 307 Md. 307, 312, 513 A.2d 893, 895 (1986), property owners operated a sewage disposal business without applying for zoning approval from county authorities. Although the property owners had enough land to comply with setback requirements under the zoning ordinance, the owners failed to comply with any of the setback requirements, and thus asked to obtain variances from these requirements. *Id*. at 339–40, 513 A.2d at 909–10. We affirmed the Board's conclusion that, under these circumstances, "Ad + Soil's 'hardship' was self-inflicted[.]" *Id*. at 340, 513 A.2d at 910.

As these cases make clear, the critical issue in determining whether a hardship is self-created is whether the property owner could have avoided the need for a variance. In other words, if a property owner has a hand in creating the "peculiar circumstances" that cause his need for a variance, the owners' hardship is self-created. But when the "peculiar circumstances" arise from the zoning restrictions themselves, the owners' hardship is not self-created. We evaluate the Board's conclusion regarding the self-created hardship criterion with this standard in mind.

After considering the evidence in the record, the Board concluded the following:

> [T]he action of the regulations on this island have eliminated the property owner's ability to develop anything without a variance. The island is small, surrounded on all sides with the waters of a Chesapeake Bay tributary, and contains steep slopes. The required minimum and expanded buffer make it impossible to develop without the variances. We specifically reject the assertion of the [Petitioners] that the previously existing house site could have been redeveloped with a residence. The proximity of the foundation to the cliff face (and now the steep slopes behind the revetment area), the soil

37

type and the action of the waves on this reduced island render the previous house site unbuildable.

The Board later amplified this conclusion as follows:

> [T]he needed variances to provide a reasonable and significant use of this property are not the result of the actions of the property owner. This island is surrounded by water— obviously. The Critical Area Program provides for a minimum 100 foot buffer landward of the mean high water line, a buffer that must be expanded to accommodate steep slopes, as here. The program requirements consume and render unbuildable the entire property. The applicant did not create the conditions that cause the need for variances here. These conditions are the result of nature or a much higher authority—depending on your belief.

We hold that these findings are supported by substantial evidence in the record. Unlike the property owners in *Cromwell*, *Chesley*, *Bounds*, or *Ad + Soil*, Wagner's hardship was a result of the impact of the zoning regulations on the Island in that the County's Critical Area protection program,[27] specifically AACC § 17-8-301(b), prohibits the construction of "new structures" within the 100-foot buffer zones near the shoreline. DCW's expert in the field of land use planning, Shep Tullier, testified that, given the Island's unique topographic features, any house proposed would require a variance. Suzanne Schappert, Planning Administrator of the Office of Planning and Zoning for Anne Arundel County, similarly testified that the site conditions mandated the variance. Several witnesses testified that a house could not be built on the footprint of the preexisting dwelling, which was too unstable.

---

[27] Anne Arundel's Critical Area Protection Program is now codified in Articles 17 and 18 of the County Code.

We reject Petitioners' arguments that the Board's granting of *any* variances was precluded by Wagner's "several illegal acts," his request for "after-the-fact" variances, or the doctrine of unclean hands. In evaluating Wagner's variance request against the self-created hardship criterion, Wagner's failure to obtain the proper permits or variances before construction is not relevant. This fact would only be relevant if Wagner's acts constituted the "peculiar circumstances" that created the need for the variances. *See supra*; *see also Stansbury v. Jones*, 372 Md. 172, 198, 812 A.2d 312, 327 (2002) ("Traditionally, self-created hardship requires an affirmative action, exclusively by a property owner or his predecessor in title, that is itself the sole reason for the need for the variance.").

The Board, while noting the "presumptuous bravado" of Wagner's acts, properly cabined its evaluation of the variance criteria to the legally relevant facts.[28] In doing so, the Board restrained itself and followed its interpretation of the law.[29] The Board's interpretation of AACC § 3-1-207—its guiding statute for the granting of variance—is entitled to deference. *See Grasslands Plantation, Inc. v. Frizz-King Enters., LLC*, 410 Md. 191, 204, 978 A.2d 622, 629 (2009) ("[A]n administrative agency's interpretation and

---

[28] In its Memorandum of Opinion, the Board voiced its disapproval of Wagner's activities, making the following observations: "[t]he applicant deserves no sympathy[;]" "Wagner openly and knowingly violated the laws of the County and State[;]" and "[t]he scene of this bald-faced machismo is not lost on these Board members."

[29] It also observed that, "for all the moral outrage that should and has resulted from the erection of this structure and its related facilities, we must caution that decisions regarding punishment are not within the purview of this Board of Appeals." The Board stated that its "careful review of these laws has revealed no mechanism by which the Board can punish bad acts and actors. We will not exercise authority that we do not possess and will not legislate from the 'bench' of the Board of Appeals."

application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts."). Thus, we find no error in the Board's conclusion that under AACC § 3-1-207(b)(4)(i), so called "after-the-fact" variances are subject to the same evaluation as "before-the-fact" variances—no more, and no less.

Petitioners' invocation of the unclean hands doctrine is equally unavailing. Petitioners cite no authority supporting the application of the unclean hands doctrine to a variance application, and we find none. This Court has clearly stated that "[t]he equitable defense of unclean hands is applicable only when a litigant is seeking relief which is equitable in nature." *Adams v. Manown*, 328 Md. 463, 487, 615 A.2d 611, 623 (1992) (Chasanow, J., concurring and dissenting) (citations omitted). *See also Black's Law Dictionary* 286 (9th ed. 2009) (defining the "clean-hands doctrine" as "[t]he principle that a party cannot seek equitable relief or assert an equitable defense if that party has violated an equitable principle, such as good faith."). Thus, the doctrine is not implicated by judicial review of an agency decision in a land use case.[30] Moreover, to hold that Wagner's presumptuous development precluded the granting of variances would be to graft an additional requirement to the variance criteria. This we shall not do.[31]

Our conclusion that Wagner's unwarranted hardship is not fully self-created is subject to other mandatory variance criteria, which we discuss in the sections that follow.

---

[30] Petitioners' reference to *Turner v. Turner*, 147 Md. App. 350, 809 A.2d 18 (2002), a case in which the intermediate appellate court affirmed the application of the unclean hands doctrine in a divorce proceeding, is inapposite.

[31] Our holding, of course, has no impact on the County's right to pursue fines or other recourse because of Wagner's construction activities.

### *Minimum Variance Necessary*

Petitioners' best argument is that the variance sought is not the minimum necessary to afford Wagner relief. AACC § 3-1-207(e)(1) dictates that in order to grant a variance in the Critical Area, it must be shown that "the variance is the minimum variance necessary to afford relief." Petitioners maintain that the Board did not explain why a house covering an impervious surface markedly larger than the original residence was the minimum necessary to afford Wagner relief, as Wagner did not produce evidence as to why he needed a house of this size. They accuse the Board of contradicting itself when it ruled that the minimum variance necessary must not exceed the Island's pre-existing impervious surface area, but then granted Wagner a variance for total structures, including the boat ramp, having impervious surface area significantly greater than that figure.

DCW and Wagner counter that the minimum variance necessary to afford relief is a subjective finding based on the facts presented, and is for the Board to determine, not the reviewing court. They highlight that this point was even agreed to by the Executive Director of the Critical Area Commission, who testified that "[i]f the Board believes that the reasonable redevelopment in a reasonably sized dwelling must be larger than the old house[,] it's the Board's discretion to make that determination." DCW and Wagner urge us to adopt the reasoning of the Court of Special Appeals in *Becker v. Anne Arundel County,* 174 Md. App. 114, 143, 920 A.2d 1118, 1135 (2007), which held that "minimum variance necessary" does not mean the absolute minimum variance possible.

As discussed earlier, Wagner bears the burden of proof on all variance criteria, and must prove that without a variance, the zoning will pose an unwarranted hardship. *See*

41

*supra.* Thus, with respect to the minimum variance criterion, the Board must find that the variance applicant has proven that the requested variance is the minimum necessary to afford relief such that the applicant will maintain a reasonable and significant use of the property.

This Court has not addressed the substance of the minimum necessary criterion with great particularity, but it was discussed by the Court of Special Appeals in *Becker.* 174 Md. App. 114, 920 A.2d 1118. There, the intermediate appellate court was asked to evaluate the Board's conclusion that variance applicants had not met their burden of proving that their request was the minimum necessary to afford relief.[32] *Id.* at 143, 920 A.2d at 1135. Concluding that the Board had not adequately supported its finding that the applicants had not met their burden, the *Becker* Court explained:

> The question of whether the variances were the minimum necessary must be considered, however, in the context of the purpose of the proposed construction, recognizing that appellants are entitled to build some type of reasonable structure. There was no finding by the Board as to appellants' reasonable needs, or reference to evidence, and why the proposed structure was not the minimum necessary to meet those needs. On remand, the Board must provide an explanation.

*Id*. at 144, 920 A.2d at 1136 (footnote omitted).

---

[32] Concerning whether the Board incorrectly applied an "absolute minimum necessary" standard as opposed to a minimum necessary standard, the Court of Special Appeals stated the following: "We note that the Board did use the word absolute at one point in its opinion, but in context it seems clear that the Board knew the correct standard. On remand, we are confident the Board will articulate and apply the correct standard." *Becker v. Anne Arundel Cnty.*, 174 Md. App. 114, 143, 920 A.2d 1118, 1135 (2007).

More recently, in *Moreland*, this Court set forth the standard that the Board must meet in issuing findings on the variance criteria. We stated:

> When the Board of Appeals merely states conclusions, without pointing to the evidentiary bases for those conclusions, such findings are not amenable to meaningful judicial review and a remand is warranted, as we determined in *Bucktail*[*, LLC v. County Council of Talbot County*, 352 Md. 530, 723 A.2d 440 (1999)] and *Annapolis Market Place*[*, LLC v. Parker*, 369 Md. 689, 802 A.2d 1029 (2002)]. In contrast, our discussions in *Mastandrea* [*v. North*, 361 Md. 107, 760 A.2d 677 (2000), *partially abrogated by statute*, Chapters 431 and 432 of the Acts of 2002, and Chapter 526 of the Acts of 2004, *as stated in Moreland*, 418 Md. 111, 12 A.3d 1223][33] and *Alviani*[ *v. Dixon*, 365 Md. 95, 775 A.2d 1234 (2001)] make clear, that when the Board of Appeals refers to evidence in the record in support of its findings, meaningful judicial review is possible.

*Moreland*, 418 Md. at 134, 12 A.3d at 1237.

We have not hesitated to be strict in requiring concrete, detailed fact findings. In *Bucktail*, we reversed the Talbot County Council's denial of a growth allocation, holding that "[f]indings of fact must be meaningful and cannot simply repeat statutory criteria,

---

[33] The legislative abrogation of *Mastandrea v. North*, 361 Md. 107, 760 A.2d 677 (2000) was carefully described in *Chesley v. City of Annapolis*, 176 Md. App. 413, 433–34, 933 A.2d 475, 487–88 (2007). In particular, the 2002 amendments to the Critical Area Law were meant to "'overrule the recent decisions of the Court of Appeals . . . [that] a board could grant a variance if the [C]ritical [A]rea [P]rogram would deny development on a specific portion of the applicant's property rather than considering the parcel as a whole.'" *Chesley*, 176 Md. App. at 434, 933 A.2d at 488 (quoting *Becker v. Anne Arundel Cnty.*, 174 Md. App. 114, 132, 920 A.2d 1118, 1128–29 (2007)); *see also* Preamble to Chapter 432 of the Acts of 2002 at 2479 ("Recent decisions by the Maryland Court of Appeals have held that a variance may be granted if the regulations would deny development on a specific portion of an applicant's property rather than considering alternative locations on-site[.]").

Where applicable, we discuss the *Mastandrea* Court's discussion of variance issues that did not prompt legislative supersession.

broad conclusory statements, or boilerplate resolutions." 352 Md. at 553, 723 A.2d at 451 (citing *Turner v. Hammond*, 270 Md. 41, 55–56, 310 A.2d 543, 551 (1973)). In *Annapolis Market Place*, we affirmed the reversal of the Board's rezoning, agreeing that the applicant had failed to present "one scintilla of evidence that indicate[d] that schools [we]re adequate to serve the development of th[e] [P]roperty" with apartments, as the applicant had proposed. 369 Md. at 722, 802 A.2d at 1049.

By contrast, in *Mastandrea*, this Court considered variations to a pathway that were made to accommodate a property owner's disabled daughter. 361 Md. at 112–13, 760 A.2d at 679–80. We affirmed the Board's finding that the granted variance was the minimum necessary to afford relief, observing that "the Board was presented with specific facts from which it could compare what shoreline access is normally permitted under the Critical Area criteria and what shoreline access the Mastandreas constructed within the critical area buffer to accommodate their disabled daughter." *Id.* at 141, 760 A.2d at 695. Likewise, in *Alviani*, we affirmed the Board's decision granting a special exception and variance request to construct an automotive service facility in Anne Arundel County. 365 Md. at 99, 775 A.2d at 1236. In evaluating the Board's consideration of the impact of the variance on the neighborhood or district where the lot was located, we stated that "[t]he Board's description [was] precise enough to enable a party or an appellate court to comprehend the area that the Board considered when deciding to grant the variances." *Id.* at 119, 775 A.2d at 1248.

When addressing the issue of reasonable and significant use, a substantial amount of deference to the Board's findings is required. *See White v. North*, 356 Md. 31, 50, 736 A.2d 1072, 1082–83 (1999) ("As long as evidence exists before the agency that would

make its factual determination as to reasonableness and significance fairly debatable, its determination ordinarily should be upheld."). With these cases in mind, we examine the Board's conclusion that the granted variances represent the minimum relief necessary to afford relief. The Board stated:

> We find that the variances granted by this opinion are the minimum necessary to afford relief here because the resulting impervious surface on site will measure no more than 3,325 square feet, that is the 3,005 square feet of historically existing square footage (which could be used by right) plus a reasonably sized (8 x 40 foot) boat ramp/driveway from the water's edge at the pier.

The Board implicitly concluded that the impervious surface covered by the new house could legitimately be increased beyond the footprint of the old house by demolishing pre-existing outbuildings with impervious surfaces totaling 1,094 square feet, and "transferring" or allotting part of that footage to the new house. We do not argue with this point, and consider it a reasonable factual inference based on the evidence. In this regard, it is meaningful that the Board did require the removal of various structures, including the gazebo, pool, patio, sidewalks, and accessory structures in order to bring Wagner's development activities down to the 3,005 square feet of historically existing impervious surface area on the island.

Had the Board stopped there, we would be affirming on this point. Yet the Board, quite inexplicably, also granted Wagner an additional 320 square feet for a boat ramp, with no discussion as to why this ramp was necessary to Wagner's reasonable and significant use, or why this area of impervious surface should not be included in the total allowed to

45

Wagner.[34]  Similarly, the Board did not seem to consider the possibility that through alterations to his home, Wagner may have been able to keep his boat ramp and stay under the 3,005 square foot maximum.  In short, the Board must provide some reasonable justification for increasing the impervious surface over that in existence before enactment of the Critical Area Law.

One possibility is that the Board agreed with the Anne Arundel County Office of Planning and Zoning that the boat ramp constituted a "water-dependent facility"[35] that did

---

[34] The Board only provided the following justification for granting the boat ramp variance:

> [T]he new proposed impervious surface must not exceed that which was previously on the island plus a small area to accommodate the movement of boats or other similar vehicles from the water **to avoid damage to the shore**.

> \*       \*       \*

> The Petitioner should be required to install and maintain a boat ramp **to prevent erosion at the water's edge from continual scour by the access vehicle of choice**.

(Emphasis added.)  For the reasons stated above, we hold that this concern does not adequately explain or justify the Board's grant of the boat ramp variance to Wagner.

[35] "'Water-dependent facilities' means those structures or works associated with industrial, maritime, recreational, educational, or fisheries activities that require location at or near the shoreline within the Buffer specified in COMAR 27.01.09."  COMAR 27.01.03.01A.  COMAR 27.01.03.01B provides that:

> An activity is water-dependent if it cannot exist outside the Buffer and is dependent on the water by reason of the intrinsic nature of its operation.  These activities include, but are not limited to, ports, the intake and outfall structures of power plants, water-use industries, marinas and other boat docking

46

not require a variance.[36]  If that is the case, the Board should not have granted a variance for the boat ramp.[37]  Alternatively, the Board may interpret the County Critical Area Program to mean that notwithstanding designation of the boat ramp as a water-dependent facility, the variance requirements still apply, and so the impervious surface of the boat ramp must still be counted as part of the whole.  We defer to the Board for interpretation of the County's Critical Area law.  Yet, as it stands, we cannot affirm the Board's Order because doing so would lend our imprimatur to a variance that was either unnecessary, or not properly evaluated by the Board.

### *Deprivation Of Rights Enjoyed By Others/Special Privilege*

Petitioners next take issue with the Board's determination that, without variances, Wagner would be deprived of rights enjoyed by others under a literal interpretation of the AACC.  The Board concluded that strict compliance with the AACC would render it impossible for Wagner to construct a home.  Thus, Petitioners contend, it held that Wagner

---

structures, public beaches and other public water-oriented recreation areas, and fisheries activities.

[36] Suzanne Schappert, Planning Administrator of the Anne Arundel County Office of Planning and Zoning, responded to Wagner's request for variances with a "Findings and Recommendation" report.  In that report, Schappert states that the office reviewed Wagner's boat ramp request and "determined [it] to be water dependent and acceptable[.]"  In later testimony before the Board, Schappert suggested that because the boat ramp had been determined to be a water-dependent facility, it did not require a variance.

[37] Under the Board's current order, one remote but not entirely implausible scenario is that Wagner would either expand his current boat ramp or build another boat ramp, claiming that one was permissible as a water-dependent facility, and the other was permissible by the Board's granted variance.  Given Wagner's previous behavior, we are wise to guard against this possibility by requiring that the Board clarify its order.

had the right to build a residence in the buffer zone without any restriction on its size and location. Petitioners argue that in so doing, the Board ignored the clear language of the AACC and State law by conferring a special privilege on Wagner—namely the privilege to build whatever structures he desires, and seek governmental approval only after those structures are built. In other words, Petitioners posit a two-pronged error: the Board erred both in finding that Wagner proved a deprivation of rights commonly enjoyed by others under AACC § 3-1-207(b)(2), and simultaneously erred by awarding a special privilege to Wagner, in contravention of AACC § 3-1-207(b)(3).

This Court has not spoken at length concerning the substance of the "rights commonly enjoyed" and "special privilege" variance criteria. That said, in *Belvoir Farms*, the Court was asked whether these two criteria could be determined via reference to pre-existing properties or properties that did not require a variance. 355 Md. at 263, 734 A.2d at 230. We did not answer the question, saying it was more appropriate for the Board to consider that issue on remand. *Id.* at 283, 734 A.2d at 241.

We are again guided by our standard of review. We hold that the Board properly considered these two interrelated issues, and that its conclusions, which were supported by substantial evidence, should be affirmed. To reiterate, the Board found that without some variances, the property owner could not construct a home on the Island, and specifically rejected the notion that a residence could be maintained on the footprint of the previous residence. It held that the construction of a home is the minimum necessary for the reasonable and significant use of a property, and that to prevent this would result in the

48

deprivation of a right enjoyed by others. In support of this, the Board observed that property owners throughout the Critical Area commonly enjoy a residence.

We have already said, in our "minimum variance necessary" discussion, that the Board of Appeals erred in its approval of more than 3,005 square feet of impervious surface without justification. In light of our ruling we decline to address further Petitioner's arguments about "special privilege."

### Adverse Environmental Effects

Petitioners' fifth argument is that the Board erroneously concluded that under AACC § 3-1-207(b)(5)(i), granting Wagner's variances would not harm water quality or the wildlife and plant habitat. They claim that it was unreasonable for the Board to base its decision on the belief that Wagner's stormwater management plan would be sufficient to protect water quality and habitat. CBF and MRA argue that the Board did not consider the adverse environmental impact caused by the construction of the new dwelling itself. Given that this construction involved excavating and grading the Island's shoreline, it is obvious to Petitioners that Wagner's activities had an adverse impact on water quality. Petitioners aver that because it was Wagner's burden to prove that his development would not harm water quality, and Wagner offered no credible evidence on this point, the Board's decision that there would be no such harm is not supported by the evidence.

DCW and Wagner rejoin that there was no evidence introduced that the work encompassed by the requested variances had any negative impact on the environment. They claim that the putative negative environmental effects were not conclusively established by CBF or MRA's experts. In contrast, they argue that there is ample evidence

49

that the Island has been stabilized and is no longer eroding or depositing soil into the river, resulting in improved water quality.

In its Order, the Board stated that no storm water would be permitted to run off into the Magothy, and required that all storm water be directed to a management control system. Moreover, the Board required that Wagner's proposed shore management system for the north and western shores be implemented. The Board agreed with DCW's expert, Charles John Klein, III, that the revetment had acted to stop erosion, which had led to a decrease in turbidity in the waters surrounding the Island. The Board further held that the reforestation at a three-to-one ratio will create a better situation on the Island than existed previously, reducing the turbidity and increasing light and plant life in the river, which will ultimately become "more conducive to the maintenance of higher life forms."

We hold that the Board's findings were supported by substantial evidence. In addition to the testimony cited above, Charles John Klein, III, testified that the development led to a net environmental enhancement on the Island. Area residents, including neighbor Thelma Hall, gave anecdotal testimony supporting the increased clarity of the water, which was further corroborated by aerial photography. Even Petitioners' expert, Tom Heil, testified that the revetment had mitigated erosion and helped to stabilize the Island. MRA President, Francis Spadaro, testified that oyster beds were covered in sedimentation, but could not identify the source of sedimentation. Another of Petitioners' experts, Justin Reel, testified about the state of submerged aquatic vegetation during three different time periods, but was unable to draw conclusions. In light of this scant contravening evidence, we uphold the Board's findings as supported by substantial

50

evidence. This conclusion does not, however, modify our holding about the "minimum variance necessary" criterion, discussed previously.

### *The Purpose And Intent Of The Critical Area Program*

Petitioners' sixth argument is that the Board ignored the spirit and intent of the Critical Area Program, in contravention of AACC § 3-1-207(b)(5)(ii). As they explain, "[g]ranting variances to a scofflaw that allow him to destroy habitat and harm water quality is not in keeping [with] the purpose of the Critical Area [P]rogram." Significantly, Petitioners posit, NR § 8-1808(d)(3)(ii) requires the local jurisdiction to presume that the application "does not conform with the general purpose and intent of [the Critical Area Program]." Finally, Petitioners state that the Board has overlooked the impact that this decision will have on the public and the rule of law.

DCW and Wagner state that the real goal of the Critical Area Program is to protect water quality, and there is substantial testimony from witnesses about the degrading conditions on the Island, and the resultant effects on water quality, before Wagner's development. They see no error with the Board's conclusion that Wagner's development was in harmony with the goal and intent of the Critical Area Program. They highlight that the Board imposed numerous conditions on Wagner, including the implementation of a storm water management system, a buffer management plan, and replanting requirements, such that the variances would be in harmony with the spirit of the Critical Area Program.

Here, the Board set forth the following findings:

> As modified by this Board and as conditioned by the Order attached hereto, these variances will be in harmony with the Critical Area Program. The Critical Area Program permits

51

residential uses on property impacted by the regulations. The residential use here will not exceed the amount of impervious surface on the island prior to development, the stormwater will be better controlled, the vegetation will be increased and enhanced with native species, a conservation easement will be in place, and sand nourishment and shore management protection will be installed. We feel that the resulting island will be a showplace for environmental enhancement, not a scourge.

As explained *supra*, the Board erred in its conclusion that the residential use here will not exceed the amount of impervious surface on the island prior to redevelopment. Excepting that, in light of the evidence regarding the lack of adverse environmental effects resulting from Wagner's development, we hold that the Board's findings on this criterion are supported by substantial evidence.

### *The Presumption*

Petitioners' final argument concerns the legal presumption under AACC § 3-1-207(b)(7) and NR § 8-1808(d)(3)(ii) that building activity requiring variances is inimical to the Critical Area Program. They claim that the Board's conclusion that Wagner could not construct a dwelling without a variance was contradicted by the fact that a pre-existing dwelling stood on the Island for over 50 years. In Petitioners' view, Wagner never explained how allowing larger structures in the buffer helped foster the goals and intent of the Critical Area Program; therefore, the Board was "duty bound" to deny the variances.

DCW and Wagner frame things differently. In their view, the presumption that Petitioners speak of only restates the law as it applies to variances in the Critical Area. Any applicant must prove that they meet the criteria set forth in the Critical Area laws. If one does not meet that criteria, then the variance is denied. In their view, the Board recognized

the presumption, weighed this presumption in evaluating the variance criteria, and properly determined that the presumption was overcome by the evidence.

In its Memorandum of Opinion, the Board addressed the legal presumption:

> To reiterate, it is the burden of an applicant to prove that they met each and every one of the variance criteria. The failure to meet just one of those criteria requires that this Board deny the requested variances. For those variances requested that have been denied, the Petitioner did not meet the requirements.

For the other requested variances, the Board found that the Petitioner met its burden, and thus granted modified variances, subject to conditions. As we have held above, the Board must re-evaluate the "minimum amount necessary" criterion. Based on this determination, the Board will decide whether Wagner has overcome the presumption that his activities are inimical to the intent of the Critical Area Program.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH INSTRUCTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AND REMAND TO THAT COURT WITH INSTRUCTIONS TO VACATE THE ANNE ARUNDEL COUNTY BOARD OF APPEALS RULING AND REMAND TO THE ANNE ARUNDEL COUNTY BOARD OF APPEALS FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**

Judge Harrell joins in the judgment only.

IN THE COURT OF APPEALS

OF MARYLAND

No. 77

September Term, 2013

_____

CHESAPEAKE BAY FOUNDATION, INC.
AND MAGOTHY RIVER ASSOCIATION,
INC. et al.

v.

DCW DUTCHSHIP ISLAND, LLC, ET AL.

_____

Barbera, C.J.,
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

_____

Concurring Opinion by Watts, J.

_____

Filed: August 4, 2014

Respectfully, I concur.[1] I would hold, however, that the Board of Appeals ("the Board") did not err in granting Wagner after-the-fact variances and in determining that the variances granted were the minimum variances necessary. I would hold that the grant of a variance for a 320-square-foot driveway/boat ramp was unnecessary, as the driveway/boat ramp is a water-dependent facility for which a variance is not required under the Critical Area Law. Despite this view, I believe it reasonable to allow the Board an opportunity to explain its opinion and explicitly address whether the County's Critical Area Program requires a variance for a water-dependent facility, and thus, I concur with the Majority's decision to remand the case to the Board.

I believe that the driveway/boat ramp is a water-dependent facility that can exist in the Critical Area independent from a variance; that this is what Board of Appeals determined in its opinion; and, further, that this is the legally correct conclusion; *i.e.*, a water-dependent facility can exist in the Critical Area independent from a variance. My reasons are as follows. In a letter dated October 31, 2006, Joseph Rutter, a Planning and Zoning Officer with the Anne Arundel County Office of Planning and Zoning, advised Danny G. Boyd, Wagner's site plan designer, that the request to consider the 40-foot by 8-foot driveway/boat ramp to be a water-dependent facility pursuant to Code of Maryland Regulations ("COMAR") 27.01.03.01A and B was acceptable. Rutter stated:

---

[1] I agree with the Majority's conclusions that: (1) CBF lacked standing to participate in the variance proceedings before the Board of Appeals on the ground that MRA, which advocated the same position, had standing; (2) Anne Arundel County Code § 3-1-107(a) does not violate the Express Powers Act; and (3) the Board of Appeals did not violate its own rules when it held that CBF could not cross-examine witnesses.

> Although vehicular access to an island home site is not specifically identified in the definition, vehicular access to an island cannot exist outside the buffer. Therefore, the driveway as reflected on the site plan . . . is **determined to be water[-]dependent and acceptable** provided the remainder of the driveway as shown on the site plan is removed and re-vegetated as the site plan reflects.

(Emphasis added).

On November 13, 2006, Rutter and Suzanne Schappert, the Planning Administrator of the Anne Arundel County Office of Planning and Zoning, submitted a "Findings and Recommendation" to the Board concerning Wagner's request for variances. In the Findings and Recommendation, Schappert and Rutter included Rutter's determination that the 320-square-foot driveway/boat ramp is a water-dependent facility, and stated:

> [T]his Office reviewed a request to allow a 40' long x 8' wide driveway on the northern side of the island as a water dependent use for access to the island. By letter dated October 31, 2006, the Planning and Zoning Officer, Joseph Rutter, indicated that vehicular access to an island cannot exist outside the Buffer and that the 40' long driveway reflected on the site plan submitted with the letter of consideration dated October 26, 2006 **is determined to be water[-]dependent and acceptable** provided the remainder of the driveway as shown on the site plan is removed and re-vegetated.

(Emphasis added).

In its Memorandum of Opinion, the Board ratified the view that the driveway/boat ramp is a water-dependent facility by granting variances that included 3,005 square feet of impervious surface "plus" the driveway/boat ramp. Specifically, the Board stated that it granted the requested variances because the Board determined that the variances

> are the minimum necessary to afford relief here because the resulting impervious surface on site will measure no more than 3,325 square feet,

that is the 3,005 square feet of historically existing square footage (which could be used by right) **plus** a reasonably sized (8 x 40 foot) boat ramp/driveway from the water's edge at the pier.

(Emphasis added). The Board determined that the driveway/boat ramp was necessary to "a[c]commodate the movement of boats or other similar vehicles from the water to avoid damage to the shore[.]" (Footnote omitted). Nonetheless, after having determined the driveway/boat ramp to be a water-dependent facility in its opinion, the Board included the driveway/boat ramp as part of the variances in its order.

The Board's inclusion of a variance for the driveway/boat ramp in its order was, from my perspective, unnecessary. A review of the case law, statutes, and regulations demonstrates that a water-dependent facility can exist in the Critical Area independent of a variance. COMAR 27.01.03.01, concerning criteria for local Critical Area program development and water-dependent facilities, provides the following definition for "water-dependent facilities":

A. "Water-dependent facilities" means those structures or works associated with industrial, maritime, recreational, educational, or fisheries activities that require location at or near the shoreline within the Buffer specified in COMAR 27.01.09.

B. An activity is water-dependent if it cannot exist outside the Buffer and is dependent on the water by reason of the intrinsic nature of its operation. These activities include, but are not limited to, ports, the intake and outfall structures of power plants, water-use industries, marinas and other boat docking structures, public beaches and other public water-oriented recreation areas, and fisheries activities.

C. Excluded from this regulation are individual private piers installed or maintained by riparian landowners, and which are not part of the subdivision which provides community piers (see Regulation .07 of this chapter).

In turn, COMAR 27.01.03.03 provides:

> In developing their Critical Area programs, local jurisdictions shall follow these criteria when addressing water-dependent facilities:
>
> A. Except as otherwise provided in this chapter, new or expanded development activities may be permitted in the Buffer in intensely developed and limited development areas provided that it can be shown:
>
>> (1) That they are water-dependent;
>> (2) That the project meets a recognized private right or public need;
>> (3) That adverse effects on water quality and fish, plant, and wildlife habitat are minimized;
>> (4) That, insofar as possible, nonwater-dependent structures or operations associated with water-dependent projects or activities are located outside the Buffer; and
>> (5) That the facilities are consistent with an approved local plan as set forth below.
>
> B. Except as otherwise provided in this regulation, new or expanded development activities may not be permitted in those portions of the Buffer which occur in resource conservation areas.

Anne Arundel County Code § 17-8-301(b) states: "Development on properties containing buffers shall meet the requirements of COMAR, Title 27."

In Citrano v. North, 123 Md. App. 234, 236, 717 A.2d 960, 961 (1998), the Court of Special Appeals considered an argument from Mr. and Mrs. Frank Citrano, appellants, that a variance was not required for a deck because the deck was a water-dependent facility. Appellants purchased residential waterfront property in Anne Arundel County within the Chesapeake Bay Critical Area and, without obtaining a building permit, constructed a fifteen-by-twenty foot deck on the property, approximately twelve feet from the shoreline. Id. at 236-37, 717 A.2d at 961. After the fact, appellants "applied for the necessary variances to permit the deck within the 100 foot critical area, on steep

slopes in a critical area, and in the front yard 38 feet closer to the front line lot line." Id. at 237, 717 A.2d at 961 (footnotes omitted). The Board denied the requested variances. Id. at 238, 717 A.2d at 961. In the intermediate appellate court, appellants contended that no variances were required because the deck was a water-dependent facility permitted in the buffer. Id. at 242, 717 A.2d at 964. Specifically, appellants argued that the deck was a water-dependent facility pursuant to the Anne Arundel County Code because it was to be used for recreational purposes and needed to be close to the shoreline.[2] Citrano, 123 Md. App. at 242-43, 717 A.2d at 964. The Court of Special Appeals disagreed that the deck was a water-dependent facility, and instead agreed with the trial court that "'it is clear that a deck is not a water[-]dependent facility under the term's definition.'" Id. at 243, 717 A.2d at 964. Significantly, the Court of Special Appeals did not indicate that a variance was required for a water-dependent facility. No Maryland case contradicts Citrano's logic.

An examination of the regulations, statute, and Citrano leads to the conclusion that new development is permitted in the buffer in the critical area, absent the need to obtain a variance, if the structure is a water-dependent facility, as that term is defined in COMAR 27.01.03.01, and so long as the general criteria in COMAR 27.01.03.03 are satisfied. In

---

[2]At the time, the Anne Arundel County Code defined "water dependent facilities" as "those structures or uses associated with industrial, maritime, recreational, education, or fisheries activities that require location at or near the shoreline such as, launching ramps, hoists, lifts, marine railways, piers, pilings, marine fuel sales, wet storage of seaworthy water craft, nature trails, crab shedding facilities, intake or discharge structures, and stormwater outfall structures." Citrano, 123 Md. App. at 242, 717 A.2d at 964 (citing Anne Arundel County Code, Article 28 § 1-101(72A)).

other words, a variance is not required for a water-dependent facility. This construction of the Critical Area Law comports with that advanced by Anne Arundel County.[3] In its brief, Anne Arundel County discusses a pier and bulkhead constructed by Wagner and states: "Neither the pier nor the bulkhead is subject to the variance process since both are 'water-dependent structures' as defined under State and County critical area law." (Citing Anne Arundel County Code § 14-8-301; COMAR 27.01.03.1A). The conclusion that a variance is not required for a water-dependent facility is bolstered by the circumstance that, similar to COMAR 27.01.03.03, Md. Code Ann., Nat. Res. (1973, 2012 Repl. Vol) ("NR") § 8-1808.5, concerning community piers and noncommercial boat docking or storage facilities, states that a water-dependent facility must satisfy certain criteria, see NR § 8-1808.5(c), and that "[a] local jurisdiction may grant a variance from the provisions of th[e] section in accordance with regulations adopted by the Commission concerning variances as part of local program development set forth in COMAR 27.01.11 and notification of project applications set forth in COMAR 27.03.01." NR § 8-1808.5(e). Stated otherwise, NR § 8-1808.5 generally permits, absent

_____

[3]At the hearing before the Board, the Chairman asked Schappert (the Planning Administrator for the Anne Arundel County Office of Planning and Zoning): "If indeed the Board were to disagree with Mr. Ru[tt]er with regards to whether or not a driveway is a water-dependent facility, would that need a variance?" In response, Schappert testified: "It's disturbance in the buffer. Yes, and it's part of the associated facilities that, you know, were referred to in the heading of the variance request." In other words, Schappert testified that, if the Board disagreed that the driveway/boat ramp was a water-dependent facility, then a variance would be required. It follows that, if the Board agreed the driveway/boat ramp was a water-dependent facility, a variance would not be required. And, the Chairman posed the question in a manner that raises an inference that the Board supports this position too.

a variance, community piers or other noncommercial boat docking or storage facilities subject to certain criteria, but if certain criteria cannot be met, an individual is permitted to request and potentially receive a variance from the provisions contained in NR § 8-1808.5.

Here, despite <u>Citrano</u>, 123 Md. App. 234, 717 A.2d 960, NR § 8-1808.5, regulations, and content of Anne Arundel County's brief, the Majority remands because the Board either did not adequately determine that the 320-square-foot driveway/boat ramp, previously found to be a water-dependent facility, qualified for a variance, or, as stated in my opinion, granted a variance that was unnecessary. Specifically, the Majority states that the Board "inexplicably[] also granted Wagner an additional 320 square feet for a boat ramp, with no discussion as to why this ramp was necessary to Wagner's reasonable and significant use, or why this area of impervious surface should not be included in the total allowed to Wagner." Majority Slip Op. at 45-46 (footnote omitted). The Majority remands the matter to the Board for clarification of its opinion and a determination as to the significance of a finding that the driveway/boat ramp is a water-dependent facility. Majority Slip Op. at 46-47.

As explained above, however, it is clear that a water-dependent facility can exist independent of any variance; *i.e.*, a variance is not required for a water-dependent facility in the Critical Area. I would conclude that the driveway/boat ramp is a water-dependent facility, as found by the Anne Arundel County Office of Planning and Zoning and confirmed by the Board. A driveway/boat ramp is a structure associated with recreational water-dependent activities, such as vehicular access to an island home and boat docking,

which require location at or near the shoreline within the buffer and that cannot exist outside the buffer. See COMAR 27.01.03.01A and B. The driveway/boat ramp fulfills the criteria set forth in COMAR 27.01.03.03A(1)-(5), in that: (1) the development activities are water-dependent; (2) the project (*i.e.*, the driveway/boat ramp) meets Wagner's recognized private right to have vehicular access to his island home; (3) the adverse effects on water quality and fish, plant, and wildlife habitat are minimized, as recognized by the Majority, which holds that the Board's findings that the requested variances would not have a negative impact on the environment are supported by substantial evidence, see Majority Slip Op. at 50-51; (4) the record does not contradict that, insofar as possible, nonwater-dependent structures and operations associated with water-dependent projects or activities are located outside the buffer; and (5) the driveway/boat ramp is consistent with the approved local plan articulated by the Anne Arundel County Office of Planning and Zoning and the Board, *i.e.*, that the driveway/boat ramp is an acceptable water-dependent facility provided that the remainder of the driveway/boat ramp shown on the site plan is removed and re-vegetated as the site plan reflects.

In sum, in my view, the record demonstrates that the Board granted variances totaling no more than 3,005 square feet of impervious space "plus" the previously determined 320-square-foot water-dependent driveway/boat ramp. As the Majority recognizes, the grant of variances totaling 3,005 square feet of impervious surface was reasonable, given "historically existing impervious surface area[.]" See Majority Slip Op. at 45. In other words, the 3,005 square feet was the minimum variance necessary,

and the Board did not err in so finding. Because I believe it appropriate to allow the Board an opportunity to speak for itself and clarify any potential doubt as to whether it determined the driveway/boat ramp to be a water-dependent facility, and as such, exempt from the need for a variance, I concur with the Majority's decision to remand.